[Crim. No. 15733. First Dist., Div. Four. Oct. 3, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
RONALD GENE PIPITONE, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Robert Chambers, Deputy Attorneys General, for Plaintiff and Appellant.

Bonjour, Gough, Stone & Remer and Jules F. Bonjour, Jr., for Defendant and Respondent.

## OPINION

**RATTIGAN, J.**—The People appeal from an order in which the superior court dismissed an information, as to respondent Ronald Gene Pipitone, after having granted his motion to suppress certain evidence pursuant to section 1538.5 of the Penal Code.[1] The question is whether the motion was properly granted. (§ 1238, subd. (c).)

---

[1] All statutory references herein are to the Penal Code. Although the record proper does not show the fact, the notice of appeal states without dispute that the order of dismissal

On June 3, 1975, after an intensive investigation conducted by narcotics officers as hereinafter described, narcotics officers searched Terrence Fagrey's apartment, found contraband there, and arrested Fagrey. They entered respondent's home later on the same day, arrested him, found contraband and related evidence in a search of the residence, and arrested Linda Pipitone, his wife.

Complaints were promptly filed in a municipal court, charging Fagrey, respondent and Linda with various offenses which involved the evidence seized in the June 3 searches. At their joint preliminary examination, the three defendants moved to suppress this evidence pursuant to section 1538.5. The magistrate denied the motion to suppress, as to respondent and Fagrey, and held them to answer. The record is unclear as to whether the motion was granted as to Linda, but she was not held to answer.

An information was thereupon filed in the superior court, charging respondent and Fagrey with appropriate offenses. Respondent again moved, pursuant to section 1538.5, to suppress the evidence seized in his residence on June 3.[2] By stipulation of the parties at the hearing on the motion, the court received in evidence a lengthy transcript of the proceedings conducted before the magistrate. The court also heard brief testimony from three of the searching officers and received physical and documentary evidence. The parties are in precise agreement as to the matters shown in all of the evidence received on the motion; their summaries of it, in the briefs, are identical. Viewed in the light most favorable to respondent (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]), it supports the following recitals:

At all pertinent times, respondent and Linda were husband and wife. Between August and December of 1974, from reliable informants and other sources, State Narcotics Officers Elsberg and Williams developed substantial information to the effect that respondent and Fagrey were engaged in the manufacture and sale of phencyclidine (PCP) and cocaine. Commencing in December, the officers placed the two suspects under close surveillance.

was made pursuant to section 1385. That being so, and the order having been made after the court had granted respondent's section 1538.5 motion, it is appealable by the People. (§ .1238, subd. (a)(7).)

[2]Fagrey did not join in this motion, and he is not a party to the appeal. He therefore disappears from the procedural chronology at this point.

In the same month, Linda was convicted on a misdemeanor charge of driving while under the influence of drugs. The convicting court made an order admitting her to probation, for two years, upon several specified conditions. One of them, the so-called "search condition" (or "search clause") required that she "[s]ubmit to any search of . . . [her] . . . person, vehicle or residence at any time of the day or night with or without warrant therefore upon the request of a peace officer." Another condition required that she ". . . not own, use or possess any narcotic or dangerous drug without prescription therefor, nor associate with any person so owning, using or possessing."

Elsberg established contact with Fagrey in January 1975, posing as a salesman of chemicals. He agreed to supply Fagrey with some phenyl-magnesium bromide (hereinafter PMB), a chemical used in the manufacture of PCP, and had a sample delivered to Fagrey through another undercover agent. He met with Fagrey in April, and agreed to sell him a larger quantity of PMB in exchange for cocaine. When the two met again, in late April, Elsberg delivered three pints of PMB to Fagrey in exchange for samples of PCP and cocaine. Williams met with Fagrey, in May, and bought a quantity of cocaine from Fagrey for $1,300.

Continuing surveillance of the two suspects, between January and May, established that Fagrey had delivered the PMB to respondent at the latter's home, that he was regularly meeting respondent there and elsewhere, and that Linda was living with respondent in the residence. During the same period, one of the officers' reliable informants had given them further information implicating respondent and Fagrey in PCP and cocaine traffic.

On June 3, 1975, the officers entered Fagrey's apartment pursuant to a search warrant, found PCP and marijuana on the premises, placed Fagrey under arrest, and proceeded to respondent's home immediately thereafter. They had made no attempt to obtain a warrant for any purpose associated with respondent or his home, but Elsberg testified that they went to the home to arrest him and to search the place pursuant to Linda's "search condition."[3] He also testified that he felt, at the time, that

---

[3]Elsberg testified before the magistrate that the officers went to respondent's home "[t]o do two things. Number one, to arrest Ronald Pipitone, and number two, to search Linda Pipitone and the residence of Linda Pipitone on condition of her search [sic]." He similarly testified in the superior court: "My purpose was to arrest the defendant, Ronald Pipitone, for furnishing and sale of controlled substances and to serve a search [sic] of the residence of Linda Pipitone upon her probationary condition."

Linda was "in violation" of her probation "for being around narcotics and associating with people that were trafficking and using narcotics."

When the officers arrived at the residence, agent Silva knocked and attracted respondent to the door by a ruse. When respondent opened the door, Silva placed him under arrest and entered the home. Finding Linda in the kitchen, he "displayed the search clause" to her and asked if she was aware of it. When she replied that she was, Silva told her "we were going to search the residence." He did not ask her consent. In a general search of the entire house, which followed, the officers found PCP, cocaine, and a book which listed various chemical ingredients of PCP. Linda was arrested after these items were found.

Receipt of all of the foregoing evidence, in the superior court, was followed by extensive discussion in which the court declared its findings on the motion to suppress. The court first found that the search of respondent's residence "could not be justified" as incidental to his arrest at the door, citing *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. The district attorney stipulated to this finding, and the People do not challenge it on the appeal.

The court then made two distinct pronouncements which must be quoted at length because they pertain to its further findings on the motion. The first was made in this exchange with defense counsel:

"MR. BONJOUR [defense counsel]: I would also ask the court to make a . . . finding . . . that upon a review of all the evidence contained in the transcript that the primary purpose of searching the house was to secure incriminating evidence against Mr. Pipitone . . . .

"THE COURT: I would so find. I think it is obvious that after the many, many months of investigation of Mr. Pipitone's activities that the *primary motivation* for the search was to arrest him and gather evidence on him. I would also find, however, that there was reason to believe that Mrs. Pipitone was possibly in violation of her search condition [*sic*][4] and that appropriate utilization of that search provision could have been made as to her. But that the *primary purpose* here was *to gather evidence against Mr. Pipitone.*" (Italics added.)

In its second pronouncement, which terminated lengthy additional discussion, the court granted the motion to suppress in the following language (italics added):

---

[4]The court obviously meant "in violation of her probation."

". . . I could understand the rationale of the majority opinion in *Russi*[5] where you are dealing with a situation where the probationer's activities are the instigating factors which lead to the search and that the probation[er] is the object of the search and incidentally someone else is involved. I must admit that I get tremendously disturbed in a case like this where it is very obvious that the search was really the extension of a very long exhaustive and extensive investigation as to Pipitone's [respondent's] activity and that *Linda's involvement was only that she resided with Pipitone.* It was clear that the search provision in my opinion was used to obtain information against Ronald without either an arrest warrant or a search warrant.

"I believe that this is clearly a case in which the dicta in *Russi* applies. This is a case where the record does disclose that the officers' intervention was *to secure evidence that would implicate the cotenant in a crime and that Linda's involvement was purely coincidental. Nothing about the manner in which this search was done or conducted or the preparation which went into it would indicate that Linda was the object of their search in any material or substantial way.*

"I believe the question of whether they could have gotten a search warrant against Ronald Pipitone [respondent] is essentially immaterial. I think that the question has to do with what they did. To conduct a search of his residence for the primary purpose of obtaining evidence against him required a search warrant, regardless of the question of whether they obtained one. . . . I think the Fourth Amendment rights of Ronald Pipitone have been violated and that a search warrant was required and none was in fact had. That the reliance upon the search clause was improper, at least as to Ronald Pipitone. The motion to suppress should be granted, and that will be my order at this time."

The Attorney General contends in his opening brief that "[t]he superior court found the search to be invalid because the officers were *more* concerned with respondent than with the probationer" (Linda), and that the court erred by "simply *weighing the percentage of concern* by officers as between cotenants where it is believed that both are engaged in criminal activity." (Italics added.) It is also argued that the court erred in "relying for authority upon dicta in *Russi* v. *Superior Court*," and that its findings were "inconsistent."

---

[5] *Russi* v. *Superior Court* (1973) 33 Cal.App.3d 160 [108 Cal.Rptr. 716].

We disagree with this interpretation of the record. The only basis for it is the first remarks quoted above, in which the court said it "would . . . find" (1) that the officers' "primary purpose" in searching the residence was "to gather evidence" against respondent; and (2) that "appropriate utilization of . . . [Linda's] . . . search provision could have been made," as to her, because "there was reason to believe" that she was "possibly" in violation of her probation. (See fn. 4, *ante.*) The Attorney General construes these remarks as importing that execution of Linda's "search provision" was the officers' *secondary* purpose because the collection of evidence against respondent was "primary," and that the court granted the motion to suppress upon the theory that the latter merely outweighed the former. We do not read the remarks to these effects, because the "primary purpose" language is an explicit and definite finding of the officers' "purpose"; the "search provision" language, speaking only to possibilities ("possibly," and "could have been"), is not.

In any event, these remarks may not be considered alone. When the motion was actually granted, the court stated that "the officers' intervention was to secure evidence that would implicate . . . [respondent] . . . in a crime," that "Linda's involvement was purely coincidental," and that she was not "the object of their search in any material or substantial way." This is a finding that the officers' *sole* purpose in conducting the search was to collect evidence against respondent. The finding therefore did not involve a weighing process, nor the calculation of relative "percentage" of the officers' "concern,"[6] in connection with any other purpose. It must control in any ostensible conflict with "findings" imported in the court's earlier remarks, and it must be read in support of the order granting the motion. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235, par. (c), p. 4226; 4 Witkin, *op. cit.,* Trial, § 345, pp. 3146-3147; Witkin, Cal. Criminal Procedure (1963) § 681, p. 665.) This disposes of the contention that the court made "inconsistent" findings.

By finding that the officers' *sole* purpose was to collect evidence against respondent, the court determined that they pursued it for the

---

[6]The Attorney General's previously quoted reference to "weighing the percentage of concern" is actually addressed to the magistrate, who referred to the officers' purpose as involving "five percent Linda, 95 percent Ronald [respondent]." The superior court suggested no such calculation. We may observe here that the Attorney General's briefs quote the magistrate's reasoning at much greater length than they quote the superior court's. Since only the de novo determinations of that court are under review, the magistrate's reasoning is wholly irrelevant. (*People v. Lawler, supra,* 9 Cal.3d 156 at p. 160.)

*ostensible* purpose of executing Linda's search condition. In granting the motion to suppress, the court accordingly applied the rule that "where the right to conduct a search is obtained ostensibly for one purpose it may not be used in reality for another."[7] (*People* v. *Roberts* (1956) 47 Cal.2d 374, 378 [303 P.2d 721]. See *People* v. *Haven* (1963) 59 Cal.2d 713, 719-720 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Ghimenti* (1965) 232 Cal.App.2d 76, 81 [42 Cal.Rptr. 504].)

In the *Russi* decision, which was cited when the motion to suppress was granted (see the text at fn. 5, *ante*), a majority of this court held that evidence obtained in a search of a probationer's residence, conducted by three police officers pursuant to a similar condition of her probation, was admissible against her nonconsenting cotenant. (*Russi* v. *Superior Court, supra,* 33 Cal.App.3d 160 at pp. 165-171.) That search, however, was initiated for the "sole" purpose of executing the search condition (*id.,* at p. 164), and only one of the officers knew that the cotenant was living in the probationer's home. (*Id.,* at pp. 164-165.) Because there was no pretext of using her probation condition to collect evidence against her cotenant (which the superior court found to have occurred here), *Russi* is entirely distinguishable. In their remarks characterized as "dicta," the *Russi* majority went no further than to draw the distinction on a hypothetical basis. (*Id.,* at p. 167.) In the present case, the superior court properly "applied" the so-called "dicta" when it perceived the distinction as a reality.

As we have indicated, the order granting the motion to suppress was correct in law insofar as it rests upon the court's terminal finding that the *sole* purpose of the search was directed to respondent and not Linda. (See fn. 7 and the accompanying text, *ante.*) This means that the order is to be sustained if the finding is supported by the evidence in point of fact.

As to Linda, the officers' visual surveillance established nothing except that she was living with respondent in the family residence and that he occasionally drove an automobile which was registered in her name. The officers received information that respondent and Fagrey were involved with a place where PCP was being manufactured, but the location was miles away from the residence and this information did not implicate Linda. The contraband seized in the residence was found in a locked cabinet to which she apparently did not have a key, or in other secreted places.

---

[7]This point was raised in respondent's brief. The Attorney General filed a closing brief, but did not respond to the point in any way. It therefore stands unchallenged.

Elsberg testified to an informant's statement that "several people had brought over large pieces of cocaine . . . to Linda and Ronald Pipitone's residence and that *they* were presently involved in some kind of a cocaine operation as well as PCP." (Italics added.) ■ The court was entitled to conclude that Linda was not reached by the term "they" as ambiguously used in this context. The court was also entitled to disbelieve the testimony of any of the officers as to their real purpose in searching the residence. (*People* v. *Lawler, supra,* 9 Cal.3d 156 at p. 160; *People* v. *Ghimenti, supra,* 232 Cal.App.2d 76 at p. 81.) We conclude that the terminal finding is supported by the evidence, and that it must be upheld on the appeal. (*People* v. *Lawler, supra.*)

The order of dismissal is affirmed.

Caldecott, P. J., and Christian, J., concurred.